IN THE UNITED STATES DISTRICT COURT FOR MARYLAND, SOUTHERN DIVISION

| | |
|---|---|
| LOREN DATA CORP <br> P.O. Box 600 <br> Indian Rocks Beach, Florida 33785 | * <br> <br> * |
| PLAINTIFF | * |
| v. | * |
| GXS, INC. <br> 9711 Washingtonian Blvd. <br> Gaithersburg, Maryland 20878 | *   Case No. <br> <br> * |
| DEFENDANT | * |
| | * |

## I - INTRODUCTION

Loren Data Corp. brings this civil action to prevent and restrain the defendant GXS, Inc. from using exclusionary and anti-competitive tactics to prevent Loren Data Corp.'s participation in the Electronic Data Interchange communications marketplace. By refusing to allow Loren Data Corp. reasonable access to its network, GXS, Inc. is unlawfully contracting, combining and conspiring to restrain trade or commerce in the Electronic Data Interchange industry (Sherman § 1) and attempting to monopolize and/or maintain its monopolistic presence in the industry. (Sherman § 2)  In addition the Plaintiff seeks damages for violations of state statutory and common law under principle of pendent and ancillary jurisdiction.

## II - THE PARTIES

Plaintiff Loren Data Corp. is a California corporation that has been engaged primarily in the provision of Electronic Data Interchange services since 1997. Its principle offices are located in Indian Rocks Beach, Florida.

Defendant GXS, Inc. is a Delaware Corporation with its principal place of business located within this district at 9711 Washingtonian Blvd, Gaithersburg, Maryland 20878. Its registered agent in the State of Maryland is Corporation Trust International, 351 West Camden St., Baltimore, Maryland 21201.

## III - JURISDICTION AND VENUE

This court has jurisdiction over this matter pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C., §15 and §25, and 28 U.S.C. §1331 and §1337.

Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 as Defendant GXS, Inc. transacts business within the borders of Maryland and is found within this district.

## IV - RELEVANT MARKET

1. Both plaintiff Loren Data Corp. (hereinafter "Loren Data") and Defendant GXS, Inc. (hereinafter "GXS") are participants in the Electronic Data Interchange industry as communications providers. The term "Electronic Data Interchange" (hereinafter "EDI") refers to the electronic exchange of business data and documents, such as purchase orders or invoices, in a standardized digital format that can be processed via the Internet by computer systems.

2. The EDI industry involves the electronic transmission of information, data and documents and constitutes an electronic commerce network between individuals, corporations, governments and other entities. EDI messages travel over a system of Value Added Network providers (hereinafter "VANs"), private networks interconnected to each other with network protocols, both privately and predominately over the Internet. The EDI industry exists as a vital carrier of intrastate, interstate and international commercial data that traverses every state (including Maryland) and international borders to and between foreign countries. EDI messages are generated, sent, received, and ingested into enterprise computing systems for parties conducting commercial trading, such as retailers and suppliers, shippers and receivers, and manufacturers and vendors. These relationships comprise trading partnerships. Trading partners make use of the global system of VANs to exchange EDI documents with each other, each independently selecting among the competing VANs. The various VANs in turn cooperate to exchange traffic amongst themselves in the interest of the trading partners. The EDI communications market is similar to the telephone market where each user chooses a particular phone company thereby gaining ubiquitous access to any other telephone user on any telephone systems. As individuals, we *expect* no less of our personal or business phone services; that our communications will be carried to their destination, over various telephone networks that cooperate to make an interconnect-dependent market viable for the consumer of such services. In the present case, however, the parties *are* VANs, the end-users are commercial trading parties, and the interconnect issue is not under the control of a regulator.

3. EDI data is exchanged between VANs using an "Interconnect," the bi-directional transfer of EDI messages from one VAN to another VAN on behalf of mutual consenting trading parties. An Interconnect is a direct, logical connection between two VANs, allowing bi-

directional data to flow in industry standard formats. It is a long standing practice in the EDI industry for VANs to grant non-settlement peer Interconnects to each other to facilitate the flow of EDI data from one EDI trading party to another when the trading parties reside on different networks. For example, retailer ABC, on the Loren Data VAN, may place an order with XYZ supplier, who is on the GXS VAN. This example message would initiate on the Loren Data VAN and would terminate on the GXS VAN; an invoice for this order would initiate on GXS VAN and terminate on Loren Data VAN. By denying peer non-settlement interconnections (the industry standard) GXS uses its dominance in the industry to monopolize the EDI market by denying peer access to Loren Data's VAN, forcing Loren Data to contract for non-native transit, or eventually causing customers on Loren Data to migrate to alternative networks that enjoy access to the GXS system.

4. Without Interconnects there would be a fragmentary EDI market for the trading partners wishing to enter into mutual trade with partners residing on other VANs; users such as retailers and suppliers would be forced to purchase mailboxes on multiple VANs. This would be akin to having to purchase telephone lines from each carrier (e.g. Verizon or AT&T) in order to place calls to customers on each telephone network if there were no interconnects between telephone carriers. It is noteworthy that these peer agreements are honored solely for the economic benefit of the EDI industry and the trading partners, as VANs do not settle with each other for inter-network message transit.

## V - STATEMENT OF FACTS

5. Defendant GXS (previously GEIS, General Electric Information Systems) is a VAN. GXS controls a significant population of EDI network user IDs in the United States and globally,

and has bolstered its ID population over the past decade via the acquisition of multiple competing VANs. The entity of GEIS, previously approximately 25% of the EDI Trading Partner ID population circa 2002, retained sufficient market influence to exert deleterious market control by denying interconnects to established VANs like the Plaintiff Loren Data. GXS has since being enlarged via the private equity investments of Francisco Partners and Golden Gate Capital and has acquired numerous large VANs, service providers, and user ID populations. By its own admission and public disclosures, GXS is generally accepted by those knowledgeable in the EDI industry, analysts, and the trade press, to exert control over 50% or more of the EDI communications market when measured by revenue, customer base, or IDs (akin to phone numbers or email addresses).

6. Loren Data has been universally recognized as a VAN since 1997, and it has been granted Interconnects with every other VAN (including the ex-IBM and ex-Inovis VANs), with the exception of GXS' core service in the US (TGMS) and UK (Tradanet). At the same time GXS has contracted, combined, and/or conspired with other VANs in the industry to granting them peer non-settlement interconnects, to the exclusion of the Plaintiff Loren Data.

7. In the past decade GXS has conducted an aggressive campaign in an attempt to control and monopolize and destroy threatened competition in the EDI communications market. In 2005 it purchased the Information Exchange (IE) division of IBM, and in 2010 it completed its merger/acquisition of Inovis, Inc. On its website GXS describes the newly merged companies as "two of the world's largest B2B integration service providers" that will "process billions of transactions per year for approximately 40,000 customers worldwide."

8. In addition GXS has acquired 90% of the EDI traffic in the United Kingdom through its Tradanet messaging system. The merged entity of GXS/Inovis has recently refused to

continue access to the GXS Tradanet network under Loren Data's contract with Inovis (see paragraph 23 below). As a result Loren Data has been unable to continue its routing obligations to several of its own customers who require access to trading partners on the GXS Tradanet network. This has effectively blocked Loren Data from the U.K. market and has interrupted commerce between Loren Data customers in the U.S. and trading partners in the U.K. Unable to satisfy its own obligations, Loren Data has lost, and will continue to lose, the business of its clients who require access to the GXS Tradanet network.

9. Therefore, the conclusion is that any network offering EDI message routing must have peer access to all GXS networks in order to conduct business. There are neither satisfactory alternative routing measures nor technologies that can substitute for a native, non-settlement peering connection into each of GXS' networks, notably TGMS, IE, InovisWorks, and Tradanet. The exchange of mutual, bi-directional EDI message traffic at network-scale is only economically feasible via non-settlement, peer interconnects using the industry standard X12.56 Interconnect Mailbag Control Structure. Loren Data cannot feasibly duplicate the GXS VAN. GXS is a competitor with dominant power that can feasibly permit access to this essential facility to Loren Data. With its industry leading size, GXS is asserting itself as the sole arbiter of who qualifies as a VAN since no one can conduct business in the market without an Interconnect to its networks.

10. Loren Data's brand named VAN, ECGrid®, provides EDI routing services predominately to application service providers through its innovative, proprietary products and procedures, managing EDI message flow between service providers and to a global pool of VANs through Interconnects. ECGrid serves a population of approximately 18,000 EDI IDs. ECGrid has been in operation for over 10 years. ECGrid® is the VAN at issue for such

Interconnects to the GXS EDI systems, including but not limited to, TGMS (through its contract with Inovis), Tradanet (blocked), IE (native peer), and InovisWorks (native peer). GXS has expressed its intention to nullify Loren Data's peer interconnects with IE and InovisWorks.

11. In November of 2000, plaintiff Loren Data approached defendant GXS to request an Interconnect. GXS represented to Loren Data that the GXS VAN Interconnect Agreement was being rewritten, and that a new agreement for VAN Interconnects would be available in the near future.

12. In February of 2001, with Interconnect discussions between the parties ongoing, GXS made available to Loren Data a "mailbox" to facilitate interim continuity of operations and, ostensibly, to accommodate the EDI traffic between trading partners residing on the GXS and Loren Data networks. Loren Data was specifically told by a GXS representative that the mailbox was a temporary measure, and that there would be no charges for use of the mailbox.

13. An EDI "Mailbox" is an endpoint for EDI information. Mailboxes are paid services for trading partners, whose connection requirements differ greatly from a peer VAN. Trading partners have a low configuration burden, do not utilize X12.56 Mailbags, and are well served by a retail service with a metered data transit model with a manual web browser interface for configuration – a GXS TGMS Mailbox requires the end-user to set-up, and manually configure each and every trading partner relationship. Mailboxes are generally set up as "Push-Pull" where the client both pushes data to the mailbox (uploads) and then pulls data down from the mailbox (downloads) on a schedule determined by the client. GXS provides a "Push-Push" configuration at extra cost, where GXS will push data to the client's system proactively. Mailboxes do not commonly have an automated file-by-file confirmation system and depend on a response from

the other trading partner, which the mailbox user has a direct relationship with, to determine if a transmission is ultimately successful.

14. VAN Interconnects are a transit point for information between networks. Interconnect configuration is managed independently by each VAN on its own end, with routine, low-level routing information shared between the two VANs' respective network operations staffs, each equally sharing the burden of configuration and support. Interconnects are virtually all "Push-Push" as the transit times must be kept to a minimum for the benefit of the trading partners. The X12.56 Mailbags allow the VANs to directly track the success and failure of each and every file sent between the VANs over the Interconnect independently of the content therein and the trading partners involved.

15. Peer networks at scale, such as Loren Data's ECGrid network with 18,000 trading partners cannot use a Mailbox since such services are designed for end users with manual configuration and only requiring occasional adjustments. GXS provisioning Loren Data ECGrid with a Mailbox, is akin to a Verizon connecting to AT&T with a home telephone line. The forcing of Loren Data to use an end-user mailbox rather than a VAN Interconnect results in degradation of Loren Data's system of providing efficient and competitive EDI communications for its clients. It is a deliberate act of under-provisioning intended by GXS to damage Loren Data in its processes, its ability to compete, and to its reputation.

16. In a sudden and unprecedented turn of events, in August of 2001, Loren Data received notice from GXS that it was formally denying a peer interconnection to the GXS network, and further demanded Loren Data pay GXS $30,000 in fees due on the temporary mailbox; otherwise, GXS would terminate the mailbox in two weeks. Loren Data's mailbox was terminated on the GXS network, and Loren Data was forced, at increased expense, to create free

direct connections to those willing, and lost the majority of the business for those with no alternative routing.

17. In June of 2002, Loren Data again formally requested an Interconnect to GXS. This request was refused despite several letters from GXS clients requesting that the Interconnect be granted, and the fact that over 80 current GXS ID holding entities had trading partners on the Loren Data ECGrid network.

18. In February 2003, IBM, at the time a large player in the EDI industry, contracted with Loren Data to provide all interconnect outsourcing for their US Federal Government and Department of Defense EDI traffic. In 2005 GXS acquired IBM's EDI network (IE). Loren Data continued to provide interconnect outsourcing for the IBM side of the merged system with invoicing to GXS commencing on April 1, 2005.

19. In August of 2003 a new Loren Data customer, Covisint, required connectivity, including routing to GXS IDs. To facilitate the Covisint contract, Loren Data settled any disputes of outstanding accounts with GXS, and in September 2003 a new formalized agreement between Loren Data and GXS was reached. However, GXS persisted in its refusal to provide an appropriately configured Interconnect using the standard protocols and configuration granted to other peer networks of scale, and Loren Data was forced by this arrangement to again rely on the retail services oriented GXS Mailbox and its manual web interfaces. As mailboxes are metered connections, Loren Data was charged for every byte sent and received, for reports, and for failed communication sessions. Furthermore, GXS' technical network interfaces were regularly degraded and modified to cripple the relationship, causing vexing, serious and damaging system-wide failures within the Loren Data network. These system-wide failures would not have occurred if GXS had allowed Loren Data the industry standard peer Interconnect. The

provisioning thereof of retail EDI mailbox services was a calculated stratagem to damage Loren Data.

20. All the foregoing occurred while GXS granted non-settlement peer interconnects to other VANs, both large (Sterling, Inovis, Easylink, NuBridges) and small (Advanced Communications Systems, I-Connect, York Worldwide). The foregoing demonstrates that Loren Data was discriminated against in a monopolistic fashion, driven by GXS' corporate desire to control the market while restraining trade and commerce to the detriment of the consuming public, by holding wholesale innovators out of the market, and stopping novel operators from bringing to market new technologies that would allow on-demand delivery models, scale economies, and heretofore unknown possibilities. Only GXS had the market power to do this before and after its spate of consolidation.

21. While this process continued between Loren Data and GXS, Loren Data missed numerous market opportunities, attained reduced market footprint, lost revenue, and was forced into taking on extraordinary expenses. GXS got what it wanted, an attenuated Loren Data in which, no matter how advanced Loren's communications technology became, potential Loren Data clients would be required to cope with ambiguous routing information and mailbox surcharges incurred on their portion of GXS transit. All other VANs enjoyed non-settlement and the advantages thereof, while Loren Data languished.

22. GXS continued in every way to bill inaccurately, deny accounting remedies, interfere in Loren Data's client relations (e.g. telling GXS customers that ECGrid is not a VAN), and telling other VANs that ECGrid IDs are on GXS' network (causing data to be misrouted at a profit to GXS). GXS continued to interfere in network operations with routine line of operations and administrative requests deteriorating over a period of years, up until the present, where

Loren Data finds it all but impossible to move a consenting client from GXS to ECGrid, and to make common inquiries in order to service basic support issues on behalf of its clients.

23. In March of 2009, Inovis, Inc., a large EDI VAN (not yet merged with GXS), offered Loren Data the ability to route to GXS customers through an InovisWorks, at a minimum rate of $3,500 per month utilizing the X12.56 Mailbag. GXS was given an opportunity to match the offer and countered with a $13,000 per month offer on the crippled Mailbox. Loren Data's GXS traffic was re-routed via Inovis by June 30, 2009. Inovis and Loren Data also maintained their non-settlement peer Interconnect for inter-network traffic routed between ECGrid and InovisWorks as peer transactions.

24. This compromised arrangement was only marginally workable compared to the horribly under provisioned and intentionally degraded GXS Mailbox. GXS customers were now having to route messages to Inovis to reach Loren Data resulting in a loss of message visibility and tracking across the networks, creating confusion, and a loss of Loren Data brand recognition and value. However, in the gestalt of having to service clients, Loren Data accepted that the Inovis connection for GXS bound traffic, was essential to continuing operations.

25. On June 1, 2010 GXS announced the completion of its merger with Inovis, which had commenced in December of 2009. Loren Data's transit agreement with Inovis expires in May of 2011. GXS has expressed intent to revert the Loren Data non-settlement Interconnect on the IBM system, the Inovis non-settlement peer Interconnect, and the Inovis mailbox to a unified commercial agreement of unknown cost. Such a reversion of multiple Interconnects and paid connections to a unified commercial agreement, under terms certain to be debilitating (given the history of bad faith dealings by the Defendant), would be an industry first - an action designed solely to disable and harm an innovative competitor.

26.. Given this history and the expressed intent of GXS (along with its new acquisition of Inovis, Inc.) to terminate its interconnects to Loren Data, thousands of companies, including GXS clients, will be unable to route their business transactions to their trading partners on ECGrid, and Loren Data's current business and potential to generate future business will be severely, if not irretrievably, damaged.

## VI - CLAIMED VIOLATIONS

### COUNT ONE - SHERMAN ACT § 1

27. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 26, inclusive.

28. By its conduct, practices and intent, Defendant GXS, Inc., has entered into contracts, combinations and/or conspiracies in restraint of trade and/or commerce among the several states and with foreign nations that exclude the Plaintiff from participation in the EDI field of business in violation of 15 USC Sec. 1. Specifically it has restrained trade and commerce by denying the Plaintiff an essential facility and by preventing the Plaintiff from competing in the EDI field by combining with other EDI providers to provide peer non-settlement interconnects to the exclusion of the Plaintiff Loren Data.

### COUNT TWO - SHERMAN ACT § 2 - ATTEMPTED MONOPOLIZATION

29. Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 28, inclusive.

30. By its conduct, practices, and intent, Defendant GXS Corporation has attempted to create a monopoly in the Electronic Data Interchange industry in violation of Section 2 of the Sherman Act, 15 U.S.C § 2. In particular the Defendant has engaged in predatory and

anticompetitive conduct, with a specific intent to monopolize the EDI industry, and under circumstances pointing to a clear probability of achieving its goal of monopoly power.

31. Defendant GXS has purchased multiple competing corporations in the EDI industry, with the intent of gaining monopoly power and using such power to foreclose competition and to destroy those competitors such as Loren Data Corp. whose innovative business models pose a threat to GXS's profit margins.

32. Defendant GXS has, to the detriment, and against the wishes of its own customers, refused to interconnect and deal with Loren Data Corp. with the intent of gaining monopoly power in the EDI marketplace and using such power to stifle progress and bar new competitors from entering the industry.

33. Defendant GXS has acquired sufficient market share that successful competition within the EDI industry is all but impossible without an interconnection to the GXS EDI network. Because of its size and prevalence, the GXS EDI network constitutes an essential facility in the EDI industry. GXS Inc.'s current market influence, coupled with their continuing acquisitions of competitors and willingness to harm their own customers in pursuit of market dominance creates a dangerous probability that GXS will soon successfully acquire monopoly power in the EDI industry, if it has not already done so.

**COUNT THREE - SHERMAN ACT § 2 - MONOPOLIZATION**

34. Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 33, inclusive.

35. Defendant GXS has willfully acquired and possesses monopoly power in the Electronic Data Interchange Industry. Defendant not only possesses a controlling percentage of

the EDI market, but is also in possession of an essential facility in the form of its EDI network, which cannot be feasibly duplicated by a competitor.

36. Defendant GXS has used its monopoly power in the EDI marketplace to exclude competition, by denying Loren Data Corp. reasonable access to the GXS network of clients, even when clients of GXS are involved in beneficial business relationships with clients of Loren Data that require interconnection in mutually agreed to trading relations. GXS has intentionally used its position as an essential facility to control EDI market prices and to harm and eliminate horizontal competition and stifle progress and innovation in the EDI industry and marketplace.

### COUNT FOUR - MARYLAND ANTITRUST LAW, COMMERCIAL LAW §11-204

37. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 38 inclusive, as well as the allegations contained in Counts One, Two and Three herein.

38. By its conduct the Defendant has by contract, combination or conspiracy with one or more persons unreasonably restrained trade or commerce in the EDI industry. (Md. Code Ann., Commercial Law Art., § 11-204(a)(1))

39. By its conduct the Defendant has monopolized, attempted to monopolize, or combined or conspired with one or more other persons to monopolize any part of trade or commerce within Maryland, for the purpose of excluding competition in trade or commerce. (Md. Code Ann., Commercial Law Art., § 11-204(a)(2))

40. And the Defendant has discriminated in price among purchasers of services of like grade and quality with the effect of substantially reducing competition, of tending to create a

monopoly in the EDI industry, and preventing competition with recipients of the discrimination or with their customers. (Md. Anna. Code, Commercial Law Art., § 11-204(a)(3))

### COUNT FIVE - TORTIOUS INTERFERENCE

41. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 40 inclusive, and in addition alleges the following:

42. By its actions the Defendant has tortiously and with deliberate intent harmed the Plaintiff's business relationships and opportunities by improper and illegal means.

### COUNT SIX - BREACH OF CONTRACT

43. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 26 inclusive, and in addition alleges the following:

45. By its actions the Defendant is in breach of its contracts with the Plaintiff both in its long-term relationship and in its current contract with Inovis, Inc.

### VII - PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Loren Data Corp. prays for relief as follows:

A. That the Court adjudge and decree that GXS, Inc., has violated, and is in violation of, Section 1 of the Sherman Act by contracting, combining and/or conspiring to restrain trade and commerce among the several states and with foreign nations.

B. That the Court adjudge and decree that GXS, Inc., has monopolized and/or attempted to monopolize interstate trade and commerce in the Electronic Data Interchange market in violation of Section 2 of the Sherman Act.

C. That the Court adjudge and decree that, in an effort to maintain its monopoly position, GXS has willfully attempted to exclude Loren Data Corp. from the EDI market thereby damaging both Loren Data and the EDI market itself.

D. That the Court adjudge and decree that the Defendant has tortiously interfered with the Plaintiff's relationships, contracts, and opportunities in the EDI market by improper and illegal means.

E. That the Court adjudge and decree that the Defendant is in breach of its contract(s) with the Plaintiff.

F. That GXS, Inc., and all persons or corporations acting under its direction or control be permanently enjoined from denying Loren Data Corp. access to the GXS network in a manner that violates the Sherman Act.

G. That the Court issue a temporary restraining order prohibiting GXS, Inc. from interfering with or altering the current contract between Loren Data Corp. and Inovis, Inc. as described herein.

H. That the Court award damages to Loren Data Corp. in the amount of $100,000,000.00 as to each Count and treble damages of $300,000,000.00 as to each count, or such other and further amounts as proof may warrant and a jury award.

I. That the plaintiff Loren Data Corporation have such other relief as the Court considers necessary or appropriate to restore competitive conditions to the markets affected by GXS, Inc.'s, unlawful conduct.

J. That the Plaintiff Loren Data Corporation recovers the costs of this action, including Plaintiff's attorney fees, and any other costs which the Court considers necessary or appropriate.

**DEMAND FOR JURY TRIAL AND RESERVATION OF RIGHTS**

Plaintiff Loren Data Corp. hereby demands a trial by jury on all issues so triable.

Plaintiff Loren Data Corp. investigation of the matters alleged and referenced herein is ongoing. Pursuant to such investigation, and as allowed by the Court, Plaintiff Loren Data Corp. expressly reserves the right to amend or supplement the claims herein in accordance with Fed.R.Civ.P 15.

Respectfully submitted,

David Bird, Esq.
12340 Pleasant View Dr.
Fulton, Maryland 20759
301-854-2690
FAX 301-854-3729
birdlaw@verizon.net
Federal Bar #23907