IN THE UNITED STATES DISTRICT COURT FOR MARYLAND, SOUTHERN DIVISION

| | |
|---|---|
| LOREN DATA CORP<br>P.O. Box 600<br>Indian Rocks Beach, Florida 33785 | *<br><br>* |
| PLAINTIFF | * |
| v. | * |
| GXS, INC.<br>9711 Washingtonian Blvd.<br>Gaithersburg, Maryland 20878 | *      Case No. 10-CV-03474-DKC<br><br>* |
| DEFENDANT | * |
| | * |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

The Plaintiff, Loren Data Corp., hereby submits its First Amended Complaint pursuant to F.R.C.P. Rule 15(a)(1).   It incorporates herein by reference its original complaint and supplements it by the following Supplemental Statement of Facts.   It makes no changes to its alleged violations of law or its prayers for relief.

### SUPPLEMENTAL STATEMENT OF FACTS

**I - Markets**

1.   Loren Data Corp provides EDI (electronic Data Interchange)  services for trading partners over value added networks (VANs) via the internet.  The EDI industry is not regulated by any government entity.

2.   A trading partner is typically a commercial enterprise that employs EDI services to transmit commercial documents such as contracts, purchase orders and invoices to another trading partner.  EDI via VAN is dramatically more efficient and cost effective than other means

of communication such as FAX or the mails or specialty shippers such as FEDEX. EDI is the vehicle by which commercial transactions can be carried out nearly instantaneously from business to business (B2B) on a worldwide scale.

3. VANs have been developed by separate enterprises such as Loren Data and GXS for the benefit of their own trading partners. There are an estimated 37 VANs in this industry. Throughout its development over the last twenty years the standard in the VAN industry has been to allow a non-settlement "interconnect" from one VAN to another for the benefit of the trading partners. Fees for EDI transmissions are paid for and collected from the trading partners who are clients of enterprises such as Loren Data and GXS. There no charges for the interconnect between the VANs, and the VANs charge their customers separately.

4. In comparison to GXS, Loren Data's share of the EDI industry is rather modest. In 2010 Loren Data estimates its trading partner relationships to be as high as 54,000 with 18,000 originating on the Loren Data end. Approximately 55% of those transactions were on the GXS VANs.

5. On the other hand, on its website GXS boasts of approximately 6 million trading partner relationships. It claims a client base of: 75% of Fortune 500 automotive companies; 80% of the top automotive OEMs; 90% of the Fortune 500 CPG companies; 20 of the top 20 Global 2,000 CPG companies; more than 70% of the Fortune 500 banks and savings institutions; 7 of the top 10 Global 2,000 banks; 65% of Fortune 500 retail companies; and 65% of the top US retailers. (http://www.gxs.com/pdfs/Data_Sheets/GXS_Fact_Sheet.pdf)

6. Loren Data's market is primarily (more than 95%) with trading partners in North America. GXS processes approximately 8 billion (according to its website) electronic transactions per year in 50 countries. In 2010 50% of its customers were based in the United

States. (press release, Jan., 2011.http://www.gxs.com/resources/media_center/pr/2011/01/gxs-experiences-growth-in-b2b-m...)  A smaller proportion of Loren Data's business was in the United Kingdom via GXS's Tradanet VAN until it was unilaterally terminated by GXS.

## II - Damages

7. Loren Data currently has less than ideal interconnects with GXS VANs through its contract with Inovis that is due to expire in May of this year.  GXS has made clear that it will only offer Loren Data an interconnect by first routing its messages to a "mailbox".  This adds another step in the chain that is entirely unnecessary, in addition to being cumbersome, inefficient, and expensive.  Through its current contract with Inovis Loren Data is charged $0.01 per kc (kilo character) of transmitted data to GXS VANs.  With the mailboxes imposed on Loren Data by GXS since 2001 it has charged  Loren Data $0.04 per kc adding an unnecessary and discriminatory expense to Loren Data of $25k to $30k per month beginning in 2001.   The industry standard is to charge $0.00 per kc for a VAN interconnect.

8. An interconnect is nothing of substance.  It does not burden anyone's system.  It is merely a gate or a check point.  Data on one VAN reaches the point of entry at the GXS VAN with information destined for a GXS trading partner.  GXS and its trading partner thus benefit by this interconnect, and GXS charges a fee to its trading partner, the end user.  Coming from the other direction GXS's trading partner sends data to another VAN such as Loren Data, and the connection is freely allowed.  GXS has not reciprocated in this exchange.

9. This system of interconnection has allowed the industry to grow and facilitated the free flow of business information and production.   It has been the standard from the beginning. However, GSX has denied interconnects to Loren Data while it combined with all other VANs at

scale to allow this facility. It has created and maintained a boycott of Loren Data in violation of §1 of the Sherman Act.

10. As stated in our original complaint GXS (previously GEIS, General Electric Information Systems) has, with the infusion of venture capital, conducted a pattern of acquisitions beginning with its purchase in 2005 of the Information Exchange (IE) division of IBM, and the purchase of Inovis in 2010.

11. GXS has breached two contracts for EDI transmission with Loren Data.

a. In February of 2003 Loren Data entered into a contract with IBM to route data to government agencies (primarily Department of Defense) through IBM's "IE-DEBX" VAN. (Compl. ¶18) After purchasing the IE division of IBM GXS rerouted this traffic through TGMS. GXS terminated its contract with Loren Data on October 31, 2009, leaving unpaid invoices due to Loren Data of $24,832.49.

b. In March of 2009 Loren Data entered into a standard non-settlement interconnect agreement with Inovis for transit over its network. In addition, Loren Data entered into a second contract in 2009 with Inovis for transit to all GXS systems to which Inovis had interconnects, including the GXS Tradanet VAN to Great Britain. After GXS purchased Inovis in June of 2010 and assumed the contract obligations of Inovis it unilaterally terminated Loren Data's transit to the GXS Tradanet VAN in Great Britain.

12. The attached letter (Exhibit A) dated September 3, 2010, from Steven Scala, Senior Vice President of GXS, to Todd Gould, President of Loren Data Corp, reveals the true intentions of GXS with regard to Loren Data when its contract with Inovis expires in May, 2011. The letter documents the strategy of GXS to eliminate 55% of Loren Data's business and extend its

monopolistic reach to Loren Data's customers.  This is why the granting of an injunction by this Court is necessary for Loren Data's survival.

13.  GXS objects that Loren Data employs a "service bureau" to handle its data.  Loren Data prefers to use the term "electronic commerce service provider" (ECSP).  The terms are interchangeable.

14.  Loren Data's customer base consists of approximately 12 ECSPs.  An ECSP will take data from a trading partner and "translate" it into EDI language for transmittal.  The trading partners who use an ECSP do so for their own business purposes.  That should be of no concern to GXS.  Loren Data does not presume to look behind a GXS transmission.  We don't know how many "hops" or "daisy chains" its data went through, and GXS has no business questioning how Loren Data produces its messages.  EDI messages are transmitted via a VAN.  Loren Data provides the VAN.  An ECSP provides numerous services besides EDI translation that a trading partner may find advantageous.  An ECSP may provide EDI access to a small business, for example, as opposed to the Fortune 500 businesses GXS brags about.

15.  What the attached letter  from Scala reveals is not only the intention of GXS to terminate Loren Data after its Inovis contract expires on May 11, but an express, naked, and rapacious intention to capture all of Loren Data's business through Loren Data's ECSPs.  Beginning on the third line from the bottom of the first page.

> "As mentioned during our discussion, we are happy to have two commercial relationships with Loren Data - one that deals with traffic that will terminate on your VAN and another for the service bureau [ECSP] that will daisy chain our EDI messages to others.  Per our previous discussions, I have been led to believe that you would have zero traffic that falls into the former of these two proposed commercial relationships."

16.  GXS makes repeated allegations in this letter that Loren Data's use ECSPs is incompatible with their standards.  That assertion is patently false, and Loren Data will provide

expert proof at trial. Loren Data will also demonstrate that GXS is notorious in the industry for low quality of "service latency, availability and overall service quality". (Scala letter, end of fourth bullet paragraph)  The fact is that Loren Data's ECGrid is one of the most, if not the most, reliable networks in the industry, with a brand equity far exceeding GXS' TGMS.

17.   The first bullet paragraph on page one of the Scala letter contains another bold revelation of GXS's true motives and intentions:

> "Our current VAN interconnect agreements expressly prohibit daisy chaining, which is the core of your business model."

18.   What GXS means by "daisy chaining" will need to be fleshed out in testimony. Perhaps it is a term of art in the industry.  What we know is that this statement and the body of this letter reveal that GXS believes Loren Data's business model employs "daisy chaining" by using ECSPs in its operations and that this is the rule for all of GXS' interconnect agreements.  It, therefore, follows that GXS intends to not renew or extend Loren Data's access to GXS TGMS through Inovis when its contract with Inovis expires in May of this year.  (The attached Exhibit B is a letter from Todd Gould to Steve Scala dated February 16, 2011, asking GXS to communicate its intentions regarding the expiration of the Inovis contract in May.  It remains unanswered as of this writing.)  The statement also reveals that GXS will not permit Loren Data access to TGMS through a contract with another VAN under terms similar to its current contract with Inovis.

19.  Most importantly this statement reveals GXS's established practice of combining with all other VANs with which it conducts business to exclude Loren Data and others with a similar business model.

## III - SUMMARY

It bears repeating what Loren Data alleges in this suit and what conduct by GXS is a violation of law. Some facts are demonstrably correct on their face, while others, though in controversy, Loren Data is prepared prove and establish with competent evidence at trial.

a. The Electronic Data Interchange business (EDI) has developed over more than two decades as a means of transmitting data, documents, and other commercial and non-commercial information between trading partners in interstate and foreign commerce.

b. The predominant means of transmitting this information is through proprietary value added networks (VANs) over the internet without government regulation.

c. VAN owners have from the beginning been able to transmit their trading partners' data by means of non-settlement interconnects with other VANs for the benefit of trading partners, i.e. data flows from a trading partner over interconnected VANs to the end user, and fees are charged to the trading partners' clients on either end.

d. Loren Data's market for EDI transmissions is primarily between trading partners in North America (more than 95%). A modest amount of its business was in the United Kingdom through GXS's Tradanet VAN until it was unilaterally blocked by GXS. GXS' business in the United States encompasses 50% of its total worldwide business.

e. Loren Data's size vis a vis GXS is vastly disproportional. While Loren Data has approximately 45,000 trading partners (encompassing both ends of the chain), GXS boasts of over six million, with three million in the United States.

f. Beginning as GEIS (General Electric Information Systems) with 25% of the market in 2001, GXS has become the largest and dominant player in the industry by the infusion of venture capital and the acquisition of other major players such as the IE division of IBM and Inovis.

g.   GXS has consistently denied Loren Data the industry standard non-settlement interconnect to its VAN. Instead it has offered, and at times Loren Data has been forced to accept, a cumbersome, inefficient, and expensive vehicle called a "mailbox" for connection to the TGMS VAN. Beginning ten years ago Loren Data was forced to pay GXS as much as $30,000.00 per month for this service. Loren Data has suffered damages as a result of this illegal price discrimination.

h. Loren Data was able to obtain a transit agreement with Inovis in 2009 that gave it access to GXS VANs at a more reasonable cost, although added technical hurdles were imposed on Loren Data under this agreement.

i. GXS acquired and merged with Inovis in 2010, and Loren Data's contract with Inovis will expire in May of this year (2011).

j.   Loren Data has developed an innovative business model through which trading partners send data to electronic commerce service providers (ECSPs) for translation to Loren Data's VAN, ECGrid. The ECSP thus enables smaller and more diverse trading partners to access EDI services at reasonable cost. This model does not in any way hinder or encumber the transmission or reception of data through ECGrid. GXS objects to this business model, but it is frankly none of their business. Loren Data is able to interconnect with all other VANs, notably the next largest VAN Sterling Systems, without any such objections. GXS's true intention is to exclude an innovative competitor from the market that adds numerous trading partners who compete with GXS.

k. GXS has expressly let it be known that, now that it controls Inovis, it will not renew or extend the transit agreement between Loren Data and Inovis when it expires in May of this year. It has further let it be known that it will not permit any other VAN that interconnects with GXS

to enter into an agreement with Loren Data that is similar to Loren Data's current agreement with Inovis.

l.  GXS has conducted an illegal horizontal boycott of Loren Data by excluding Loren Data's ECSP business model, thus making it impossible for Loren Data to access the GXS VANs either directly or indirectly.

m.  Currently about 55% of Loren Data's business travels on GXS VANs.  We estimate that GXS controls at least a similar percentage of the entire EDI market.  What business that has labored in its field for twenty years could survive a loss of 55% of its business?

n. Based on all of these facts, and as more fully argued in our Answer to the Defendant's Motion to Dismiss, Loren Data maintains, and is prepared to prove, that Loren Data has suffered, and will continue to suffer, damages as a result of the particular violations of law as claimed in its Complaint.

Wherefore, the Plaintiff reiterates it prayers for relief in its original Complaint.

Respectfully submitted,

/S/

David Bird, Esq.
12340 Pleasant View Dr.
Fulton, Maryland 20759
Bar # 23907
301-854-2690
301-854-3729 (FAX)
birdlaw@verizon.net

# EXHIBIT A



GXS
9711 Washingtonian Blvd.
Gaithersburg, MD 20878

800-560-4347  t
301-340-4000  t
301-340-5299  f
www.gxs.com

September 3, 2010

Mr. Todd Gould
President
Loren Data Corporation
PO Box 600
Indian Rocks Beach, Fl 33785

Dear Todd:

Thanks for taking the time to discuss the points addressed in my email dated August 6, 2010.  While I had hoped that we would have come to a successful resolution of all the items discussed, I wanted to follow up and reiterate our proposal.

As we discussed, we have come to learn that your model is almost entirely that of a service bureau and not that of a VAN interconnect.  As such, there are fundamental and meaningful differences for GXS and they include:

- Our current VAN interconnect agreements expressly prohibit daisy chaining, which is the core of your business model;

- Loren Data will choose the third parties who will gain access to the GXS network.  Our current VAN Interconnect model allows GXS to choose the third parties to which we are connected and allows us to ascertain all aspects of the connection, ranging from the industry serviced, technical capability, economic viability, and branding.  A GXS connection to Loren Data fundamentally makes you now the arbitrator of these decisions and potentially exposes GXS to reputational issues and risk of harm to our network;

- The value proposition is different.  EDI VAN's are primarily focused on growing their communities, and the VAN interconnect is a small component of the value proposition. A service bureau is focused on selling one thing, a VAN interconnect to GXS.  In essence you have become a GXS reseller and not a partner focused on growing the EDI community – your business model is that of an enabler from one EDI VAN to another.

- We cannot be assured of the service quality with daisy chaining.  We have designed a historical VAN interconnect program such that messages traverse one network and stop. This one-hop approach has limited the number of issues that arise regarding latency, tracking and tracing a message.  Our VAN interconnect request approval process has focused on ensuring we connect with competent organizations in this regard.  As I am sure you can appreciate our brand is directly impacted by the perceptions of those that we hand data off to.  We have made our internal investments in this regard given numerous EDI engines that hand data off to one another.  A proliferation of daisy chaining increases GXS risks in its ability to manage service latency, availability and overall service quality.

The facts simply cannot support your claim that you are the same as a VAN interconnect and should be treated as such.  As mentioned during our discussion, we are happy to have two commercial relationships with Loren Data--one that deals with traffic that will terminate on your VAN and another for the service bureau that will daisy chain our EDI messages to others.  Per our previous discussions, I have been led to

believe that you would have zero traffic that falls into the former of these two proposed commercial relationships.

Our proposal is that your service bureau traffic be governed by a new commercial agreement. We envision that this commercial agreement would include;

- Connectivity to GXS using your preferred connectivity of 12X.58 while continuing the dialogue on a newer protocol that would resolve the downstream tracking, tracing and logging associated with your daisy chain business model;

- Replacing the three separate agreements in place today between our two organizations with one commercial agreement that aggregates the volume, with economic and business terms and conditions to be negotiated;

- Developing a new term to reflect the unique relationship between our two firms, designed to ensure that all customers using this connectivity are aware that it is different than a VAN Interconnect and may include daisy chaining. While we have proposed the term "service bureau" we are certainly open to other terms including your suggestion of a "clearing house";

- Resolving the past accounts due issue which now totals over $70,000; and,

- Developing a regional or geographic framework. GXS needs to have visibility into future downstream networks you might enable in countries where GXS has not commercialized a given offering. This was recently highlighted with the issues in the United Kingdom where your connection to GXS is being leveraged in the United Kingdom. We never commercialized the offering in the United Kingdom and as a result no GXS personnel were trained for enablement or support, nor have we deployed certain tools. As a result, we now find ourselves having to deal with commercial usage of an ad hoc connection that is not supported by our engineering or support organizations. Our infrastructure, support personnel and cost structure is different in each country and we would need to understand your needs by country and be compensated for our additional costs to address these needs.

We hope that you will reconsider your position and respond favorably to our proposal. Should you have any questions about this proposal, please do not hesitate to contact me at anytime.

Sincerely,

Steven Scala
Senior Vice President
GXS, Inc.

# EXHIBIT B



February 16, 2011

Steve Scala
GXS, Inc.
9711 Washingtonian Blvd
Gaithersburg, MD 20878

VIA: E-MAIL

RE: Inovis Transit Agreement

Dear Steve:

In light of our current litigation, it is important that GXS communicate to us its specific intentions regarding the renewal of the Inovis Transit Agreement that is coming up in May.

If you could respond at your earliest convenience, I would appreciate it.

Regards,

Todd Gould
President

cc: David Bird, Esq.