IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LOREN DATA CORP.                         :

                                         :

        v.                               :    Civil Action No. DKC 10-3474

                                         :

GXS, INC.                                :

                                         :

**MEMORANDUM OPINION**

Presently pending and ready for review in this antitrust case is the motion to dismiss filed by Defendant, GXS, Inc. (ECF No. 9). The issues have been fully briefed and the court now rules, no hearing deemed necessary. *See* Local Rule 105.6. For the following reasons, the motion to dismiss will be granted.

**I.   Background**

**A.      Factual Background[1]**

Plaintiff Loren Data Corporation and Defendant GXS, Inc. are Electronic Data Interchange providers. Loren Data is a California corporation with its principal place of business in Indian Rocks Beach, Florida, while GXS is a Delaware corporation with its principal place of business in Gaithersburg, Maryland.

---

[1] The facts are taken from Loren Data's initial complaint (ECF No. 1) and the supplemental statement of facts in the amended complaint. (ECF No. 13).

Electronic Data Interchange ("EDI") is described by Loren Data as "the electronic exchange of business data and documents, such as purchase orders or invoices, in a standardized digital format that can be processed via the Internet by computer systems." (ECF No. 1 ¶ 1). EDI messages are generated, sent, received, and ingested into enterprise computing systems for parties engaged in commercial trading, such as retailers and suppliers, shippers and receivers, and manufacturers and vendors. These messages travel over a system of private networks interconnected to each other with network protocols called Value Added Networks ("VANs") that are secure. For example a shipper might send a purchase order formatted in EDI over a VAN to its trading partners. Although VANs are privately owned, trading partners on different VANs can still communicate with each other if their VANs are connected. One common way this occurs is through an interconnect jointly maintained by two VAN providers; another option is through a commercial mailbox. Plaintiff contends that it is long standing practice in the EDI industry for VANs to grant "non-settlement peer Interconnects" to each other to facilitate the flow of EDI data. In a non-settlement peer Interconnect, EDI messages are transferred from one VAN to another with each VAN absorbing its own costs. A commercial mailbox is a paid service for transmitting messages

sent on one VAN to trading partners using a different VAN. The VAN typically charges for use of a commercial mailbox based on the amount of data being transmitted. Mailboxes also differ from interconnects in that the messages are not delivered to the receiving trading partner with the same ease and speed.

Loren Data and GXS both operate VANs. Loren Data's VAN has the brand name of ECGrid and has been in operation for over ten years. It currently serves approximately 18,000 IDs (akin to phone numbers or email addresses) primarily in North America. GXS manages a significantly larger VAN branded as "TGMS" and also controls the legacy VANs IE, InovisWorks, and Tradanet that it obtained through merger or acquisition from former VAN providers. In 2002 GXS' predecessor, GEIS, controlled approximately 25% of the EDI IDs. Since that time, GXS acquired the Information Exchange (IE) VAN, a former division of IBM, and it merged with Inovis. Accordingly to Loren Data, it is now generally accepted that GXS controls 50% or more of the EDI market when measured by revenue, customer base, or IDs.

In November 2000, Loren Data approached GXS to request an interconnect. At that time GXS told Loren Data that it was in the process of rewriting its VAN Interconnect Agreement and a new agreement would be available soon. In February 2001, while the parties continued negotiations regarding a potential

interconnect, GXS made an EDI mailbox available to Loren Data as a temporary measure. Then in August 2001, GXS notified Loren Data that it would not provide a peer interconnect to the GXS network and that Loren Data's temporary mailbox would be terminated if Loren Data did not pay the $30,000 due in fees. Loren Data's mailbox was terminated two weeks later, and it was forced to make alternate arrangements for its customers with trading partners on the GXS VAN or lose their business. In 2002 Loren Data made a similar request to interconnect with the GXS Van that was also denied.

In February 2003, IBM contracted with Loren Data to provide interconnect outsourcing for its federal government and Department of Defense EDI traffic. When GXS acquired IBM's EDI network in 2005, GXS honored the agreement for several years and Loren Data was able to maintain its interconnect with the former IBM VAN. Loren Data alleges that the contract was terminated on October 31, 2009, however, leaving Loren Data due $24,832.89 in unpaid invoices.

In August 2003, one of Loren Data's customers, Covisint, required routing to GXS' IDs and, thus, Loren Data had to settle its outstanding accounts with GXS and initiate a new formal agreement with GXS. GXS still refused to provide an interconnect and instead set up a metered mailbox with manual

web interfaces. Loren Data maintains that "GXS' technical network interfaces were regularly degraded and modified to cripple the relationship, causing vexing, serious and damaging system-wide failure with the Loren Data network" and that these failures would not have occurred if Loren Data had been permitted to interconnect with GXS. (*Id.* ¶ 19). Loren Data further alleges that during this time period GXS granted non-settlement peer interconnects to other VANs, large and small, and that because Loren Data was denied an interconnect it missed market opportunities, attained reduced market footprint, lost revenue, and incurred extraordinary expenses.

In March 2009, Inovis, Inc. offered Loren Data the option to route to GXS' customers through the InovisWorks VAN at a monthly rate of $3500.00. Loren Data accepted this agreement and all its GXS traffic was re-routed through InovisWorks by June 30, 2009. Loren Data alleges that this arrangement was only marginally better than the metered mailbox, however, because it resulted in a loss of message visibility and tracking across networks, creating confusion and loss of name recognition for Loren Data. In addition, in June 2010, GXS announced the completion of its merger with InovisWorks and expressed its intent to renegotiate the terms of the Loren Data/Inovis interconnect when it expired in May 2011. In particular, GXS

expressed its intent to return to using a metered mailbox for Loren Data messages. Loren Data alleges that through its current mailbox arrangement GXS charges it $.04 per kilo character (kc) of transmitted data, amounting to as much as $25,000-$30,000 per month in charges since 2001. Under its agreement with Inovis Loren Data was only charged $.01 per kc. Loren Data further alleges that with a typical non-settlement interconnect there is no charge per kc.

### B.    Procedural Background

On December 13, 2010, Loren Data filed a six count complaint in federal district court alleging that: (1) GXS violated section 1 of the Sherman Act, 15 U.S.C § 1, by entering into contracts, combinations and/or conspiracies in restraint of trade or commerce; (2) GXS violated section 2 of the Sherman Act, 15 U.S.C. § 2, by attempting to create a monopoly in the EDI industry; (3) GXS violated section 2 of the Sherman Act by willfully acquiring and possessing monopoly power in the EDI industry and using its monopoly power to exclude competition; (4) GXS violated Maryland Antitrust law, Md. Code Ann., Com. Law § 11-204; (5) GXS is liable for tortious inference with Loren Data's business relationships; and (6) GXS breached its contracts with Loren Data. (ECF No. 1). On February 3, 2011, GXS filed a motion to dismiss the complaint for failure to state

a claim and lack of subject matter jurisdiction.  (ECF No. 9).

Loren Data subsequently filed an amended complaint adding a

supplemental statement of facts but otherwise simply

incorporating the claims from its original complaint.

(ECF No. 13.)  The parties have stipulated that GXS' motion to

dismiss and Loren Data's opposition may be deemed to apply to

the first amended complaint.  (ECF Nos. 16, 17).

## II.  Standard of Review

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P.

12(b)(6) is to test the sufficiency of the plaintiff's

complaint.  *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243

(4th Cir. 1999).  Except in certain specified cases, a

plaintiff's complaint need only satisfy the "simplified pleading

standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S.

506, 513 (2002), which requires a "short and plain statement of

the claim showing that the pleader is entitled to relief."

Fed.R.Civ.P. 8(a)(2).  Nevertheless, "Rule 8(a)(2) still

requires a 'showing,' rather than a blanket assertion, of

entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 n.3 (2007).  That showing must consist of more than "a

formulaic recitation of the elements of a cause of action" or

"naked assertion[s] devoid of further factual enhancement."

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(internal citations omitted).

In its determination, the court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999)(citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Iqbal*, 129 S.Ct. at 1950, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### III. Analysis

#### A.    Sherman Act Claims

#### 1.    Section 1 of the Sherman Act

Count I of Loren Data's complaint alleges a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." *Id.*  GXS contends that Loren Data has failed to state a claim under section 1 because neither the alleged facts nor any reasonable inference therefrom shows a contract or agreement to conspire between GXS and other EDI providers.  In response, Loren Data argues that GXS' refusal to deal with Loren Data while simultaneously combining to allow all other VANS to interconnect constitutes a group boycott and is a *per se* violation of section 1 of the Sherman Act.  (ECF No. 14, at 2).

"Section one of the Sherman Act applies only to concerted action; unilateral conduct is excluded from its purview." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 761 (1984)), *cert. denied*, 502 U.S. 1074 (1992).  As the United States Court of Appeals for the Fourth Circuit emphasized in *Virginia Vermiculite, Ltd v. Historic Green Springs, Inc*, 307

F.3d 277, 282 (4th Cir. 2002), *cert. denied*, 538 U.S. 998 (2003),
"concerted activity susceptible to sanction by section 1 is
activity in which multiple parties join their resources, rights,
or economic power together in order to achieve an outcome that,
but for the concert, would naturally be frustrated by their
competing interests (by way of profit-maximizing choices)."

The pleading requirements to state a claim for violation of
section 1 are quite clear.  Section 1 "requires a complaint with
enough factual matter (taken as true) to suggest that an
agreement was made." *Twombly*, 550 U.S. at 556.  A plaintiff may
plead an agreement by alleging direct or circumstantial
evidence, or a combination of the two.  *West Penn Allegheny
Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99-100 (3[d] Cir. 2010).
The Supreme Court in *Twombly* further held "[a]n allegation of
parallel conduct and a bare assertion of conspiracy will not
suffice.   Without more, parallel conduct does not suggest
conspiracy, and a conclusory allegation of agreement at some
unidentified point does not supply facts adequate to show
illegality."   550 U.S. at 556-57.   In dicta, the *Twombly* court
indicated that a section 1 claim should include information as
to the specific time and place of the illicit agreement and the
names of the parties to the agreement.  *Id.* at n.10.  Subsequent
decisions from the courts of appeal have dismissed claims under

section 1 for failure to provide these specific details about the agreement. *See, e.g., Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008).

In addition to pleading the existence of an agreement, the plaintiff must prove that the conspiracy or combination to which the defendant was a party imposed an unreasonable restraint on trade. Courts generally evaluate whether a restraint is unreasonable under one of three approaches: "(1) *per se* analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justification, and (3) the full "rule of reason," for restraints whose net impact on competition is particularly difficult to determine." *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508-09 (4th Cir. 2002). Under the *per se* approach, courts are permitted to make "categorical judgments that certain practices, including price fixing, horizontal output restraints, and market-allocation agreements, are illegal *per se*." *Id.* (citing *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985)). "Practices suitable for *per se* analysis have been found over the years to 'be ones that would always or almost always tend to restrict competition and decrease output,' and that are not 'designed to increase

11

economic efficiency and render markets more, rather than less, competitive.'" *Id.* (quoting *Broad. Music, Inc. v. CBS*, 441 U.S. 1, 19-20 (1979)).  When a practice qualifies for *per se* analysis there is a "conclusive presumption that the restraint is unreasonable." *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343-45 (1982).  Under the rule of reason approach, by contrast, a factfinder must "decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Id.* at 343.  Rule of reason analysis requires a detailed analysis of "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Continental Airlines, Inc.*, 277 F.3d at 509 (quoting *Nat'l Soc'y of Prof'l Engr's v. United States*, 435 U.S. 679, 692 (1978)).  The intermediary level of analysis, quick-look, is appropriate for practices that have an obvious anticompetitive impact upon a quick look, but also obvious procompetitive justifications. *Id.*

Loren Data has not alleged adequate facts to establish that GXS contracted, combined, or conspired with other VANs to boycott Loren Data.  The complaint contains only the conclusory allegations that "Defendant GXS, Inc. has entered into contracts, combinations, and/or conspiracies in restraint of trade and/or commerce" and that it "combined with other EDI

providers to provide peer non-settlement interconnects to the exclusion of Loren Data." (ECF No. 1 ¶ 28). The complaint does not identify the parties with whom GXS agreed to restrain trade, the time or place at which such an agreement was reached, or the specific contours of such agreement. Inserting the word "combine" into its allegation is not enough to state a claim under section 1.

Elsewhere Loren Data alleges that GXS provided peer interconnects to other VANS, (*see* ECF No. 1 ¶ 20 (alleging that GXS provided interconnects to Sterling, Inovis, Easylink, NuBridges, Advanced Communications Systems, I-Connect, and York Worldwide)), but Loren Data does not allege that these VANs failed to provide peer interconnects to Loren Data, that they were ever forced to deny interconnects by GXS, or that they agreed to deny interconnects to Loren Data. To the contrary, Loren Data alleges that "it has been granted Interconnects with every other VAN." (*Id.* ¶ 6). Agreements between other VANs to establish peer connects with GXS do not constitute an agreement to boycott Loren Data. To the extent Loren Data intended to allege that other VANs agreed that GXS would boycott Loren Data, this is an agreement lacking any substance as GXS does not need the permission or consent of third parties to decide whether it will do business with Loren Data. *See Monsanto Co. v. Spray-*

*Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. . . . And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination.").

Loren Data's argument that horizontal group boycotts constitute *per se* violations of section 1 is irrelevant because Loren Data has not alleged any facts to suggest the existence of a horizontal group boycott. At most Loren Data has alleged GXS was boycotting Loren Data and other VANs did not try to stop GXS from doing so.[2] Single party boycotts are not *per se* violations of the Sherman Act.

## 2. Section 2 of the Sherman Act

Counts II and III of Loren Data's complaint allege violations of section 2 of the Sherman Act, 15 U.S.C. § 2. Section 2 makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or

---

[2] In its first amended complaint Loren Data alleges that GXS has "let it be known that it will not permit any other VAN that interconnects with GXS to enter into an agreement with Loren Data that is similar to Loren Data's current agreement with Inovis." (ECF No. 13 ¶ k). No further details are alleged to indicate how, when, or to whom this intention was conveyed or how GXS intends to carry out its intent. This allegation is far from adequate to allege an illegal boycott or any other form of conspiracy to restrain trade.

14

persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations[.]" 15 U.S.C. § 2. The elements of claims alleging monopolization and attempted monopolization are quite similar. To state a monopolization claim, a plaintiff must show possession of monopoly power in a relevant market, willful acquisition, or maintenance of that power in an exclusionary manner as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident, and causal antitrust injury. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990). To state a claim for attempted monopolization, a plaintiff must demonstrate: (1) a specific intent to monopolize the relevant market; (2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517 (4th Cir. 2003).

> ### a.    Maintaining a Monopoly

`    GXS argues that Loren Data has failed to state a claim for monopolization in count III because it has not alleged facts to show that GXS lacked a legitimate business justification for the challenged actions or even that GXS failed to deal with Loren

Data in an anti-competitive fashion.  GXS also argues that Loren Data has failed to allege a relevant product or geographic market for the supposed monopoly, or that GXS possessed a monopoly.  (ECF No. 9-1, at 21-38).

### 1)	Possession of Monopoly Power in Relevant Market

Monopoly power is defined as "the power to control prices or exclude competition."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  "Proof of a relevant market is the threshold for a Sherman Act § 2 claim.  The plaintiff must establish the geographic and product market that was monopolized."  *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986) (citing cases), *cert. denied*, 481 U.S. 1050 (1987).  The requirements for the relevant geographic market were explained by the Fourth Circuit in *Consul*:

> [T]he geographic market should consist of an area in which the defendants operate and which the plaintiff can reasonably turn to for supplies." [*RCM Supply Co. v. Hunter Douglas, Inc.*,] 686 F.2d [1074] at 1077 [4th Cir. 1982] (emphasis in original). *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-34 (1961). The penultimate question, towards which this preliminary inquiry into market definition is directed, is whether the defendant has market power: the ability to raise prices above levels that would exist in a perfectly competitive market.  The geographic demarcation should not be too tightly drawn, unless clear evidence exists that potential competitors outside the region are hindered from entering. A market drawn too tightly, either

16

> in geographic terms that exclude potential
> suppliers or in product terms that exclude
> potential substitutes, creates the illusion
> of market power where none may exist.

*Id.* at 494-95 (internal footnote omitted). "In sum, 'a relevant market, then is the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market.'" *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 430 (4th Cir. 1986) (quoting L. Sullivan, Handbook of the Law of Antitrust § 12, at 41 (1977)).

At the pleading stage, Loren Data need only identify a geographic market that could meet this criteria. Loren Data seems determined, however, to comply with this straightforward pleading requirement in the most circuitous fashion. As GXS notes, neither the original complaint nor the supplemental statement of facts in the amended complaint contain a clear statement of the relevant geographic market. Instead, the amended complaint contains allegations such as "Loren Data's market is primarily (more than 95%) with trading partners in North America," (ECF No. ¶ 6), and that "50% of [GXS'] customers were based in the United States." Loren Data also alleges, however, that a "smaller portion of Loren Data's business was in the United Kingdom" (*id.*) and references GXS' VAN in the UK. (*Id.* ¶ 8). From these allegations it is not entirely clear

17

whether Loren Data maintains that the relevant geographic market is North America or that the relevant market is North America and the United Kingdom. Additionally, while the original complaint included a section entitled "Relevant Market" (ECF No. 1, at 2-4), this section did not delineate the geographic limits of the relevant market; it merely discussed the EDI industry in generic terms. It is only in Loren Data's opposition to the motion to dismiss that it unequivocally states "Loren Data competes with GXS in the EDI market in North America." (ECF No. 24). Ordinarily a plaintiff cannot rely on allegations not made in the actual complaint to survive a motion to dismiss. In this case, one could discern that North America is the relevant market from the allegations in the complaint, but it is not the only conclusion that could be drawn. But because Loren Data's claim has other failings, it need not be determined whether the inconclusive statements as to geographic market are adequate to state a claim.

With respect to the product market, competing products are in the same market if they are readily substitutable for one another. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes

for it."). Well-defined submarkets may also exist within a broader market, "which, in themselves, constitute product markets for antitrust purposes." *Id.* (citing *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 593-95 (1957)). "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

Here, Loren Data identifies the Electronic Data Interchange industry as the relevant product market in which GXS allegedly possesses monopoly power by controlling at least 50% of the market. (ECF No. 1 ¶¶ 5, 35, and B). The complaint further explains details regarding the Electronic Data Interchange industry and its contours. Whether this industry constitutes a submarket for antitrust purposes is a factual allegation that ultimately should be determined by the factfinder, but at this stage it cannot be said that Loren Data has failed to plead a relevant product market in terms sufficient to state a claim.

GXS also argues that control of only fifty percent of the market is inadequate as a matter of law to constitute a monopoly. (*See* ECF No. 9-1, at 37 (citing *United States v.*

*Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001), *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 694 n.18 (10th Cir. 1989), *Spirit Airlines, v. Nw. Airlines*, 431 F.3d 917, 935-36 (6th Cir. 2005)). It is true that some courts have held that 50% or 60% of market share, absent other relevant factors, is not enough to demonstrate the existence of monopoly power. *See, e.g., PepsiCo, Inc. v. Coca-Cola, Co.*, 315 F.3d 101, 109 (2d Cir. 2002) ("absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power."); *In re Se. Milk Antitrust Litig.*, 730 F.Supp.2d 804, 822 (E.D.Tenn. 2010) ("As a general rule, however, monopoly power requires proof of more than 60% market power."). Monopoly power is a factual determination, however, and courts consider many factors beyond percentage of market share including: "the size and strength of competing firms, freedom of entry into the field, pricing trends and practices in the industry, ability of consumers to substitute comparable goods on services from outside the market, and consumer demand factors." *Weiss v. York Hosp.*, 745 F.2d 786, n.72 (3d Cir. 1984) (citing. L. Sullivan, *Handbook of the Law of Antitrust* §§ 22-32 (1977)), *cert. denied*, 470 U.S. 1060 (1985). Loren Data's complaint included allegations relating to many of these factors, and, thus, the

claim cannot be dismissed based on Loren Data's failure to allege a market share greater than 60%. *See also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.") (citing cases).

### 2)     Willful Exclusionary Conduct

The possession of monopoly power does not violate section 2 of the Sherman Act unless it is accompanied by an element of willful anticompetitive conduct. *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Where the alleged anticompetitive conduct is conduct that would constitute a *per se* violation of section 1 of the Sherman Act, willfulness is presumed.  For other alleged violations, a plaintiff must demonstrate that the defendant did not have legitimate business reasons for its conduct or that the defendant engaged in exclusionary conduct manifesting "a willingness to forsake short-term profits to achieve an anticompetitive end" and "a distinctly anticompetitive bent." *Id.* at 409.  Loren Data alleges that GXS denied Loren Data reasonable access to the GXS network of clients and intentionally used its position as an essential facility to

control EDI market prices and to harm and eliminate horizontal competition. (ECF No. 1 ¶ 36). In its motion to dismiss, GXS argues that the alleged facts demonstrate that GXS did not refuse to deal with Loren Data because GXS had legitimate business reasons for its actions and because the GXS VAN is not an essential facility. (ECF No. 9-1, at 21-27).

First, as to the allegation that GXS denied Loren Data reasonable access to the GXS network of clients, "as a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *See United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). The Supreme Court has "held that a firm with no antitrust duty to deal with its rivals at all is under no obligation to provide those rivals with a sufficient level of service." *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 129 S.Ct. 1109, 1115 (2009) (citing *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004)). The Court further held that a firm "certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." The rationale behind this rule was set forth in *Trinko*:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share

22

the source of their advantage is in some
tension with the underlying purpose of
antitrust law, since it may lessen the
incentive for the monopolist, the rival, or
both to invest in those economically
beneficial facilities. Enforced sharing also
requires antitrust courts to act as central
planners, identifying the proper price,
quantity, and other terms of dealing-a role
for which they are ill suited. Moreover,
compelling negotiation between competitors
may facilitate the supreme evil of
antitrust: collusion.

540 U.S. at 407.

Nevertheless, "[t]here are also limited circumstances in
which a firm's unilateral refusal to deal with its rivals can
give rise to antitrust liability." *Pacific Bell Tel. Co.*, 129
S.Ct. at 1119 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing
Corp.*, 472 U.S. 585, 608-611 (1985)). In *Aspen Skiing*, the
Court found that a rival's refusal to deal with its competitor
violated section 2 because the defendant's conduct revealed a
distinctly anticompetitive bent. 472 U.S. at 608-611. In other
words, *Aspen Skiing* recognized an affirmative duty to deal where
refusal to do so would result in an important change in a
competitive market with negative consequences for consumers. In
*Aspen Skiing*, the defendant owned three out of the four mountain
ski areas in the Aspen region. For many years the defendant had
cooperated with the owner of the fourth ski area to offer a
combined multi-day, all area ski ticket with proceeds split in

23

accordance with purchasers' use of lifts at the four areas. Over time the defendant demanded a greater percentage of the profits and ultimately cancelled the joint ticket and refused even to sell lift tickets at retail price to the owner of the fourth area. In upholding the jury finding that defendant's conduct violated section 2, the Court reasoned that "the jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." *Id.* at 608.

A claim of refusal to deal is only cognizable if it harms competition generally and not solely the competitor challenging the monopolist's action. *See Rural Tel. Serv. v. Feist Publ'ns*, 957 F.2d 765, 768 (10th Cir.), *cert. denied*, 506 U.S. 984 (1992); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) ("[alleged anticompetitive conduct] must harm the competitive process and thereby harm consumers. In contrast, harm to one or more competitors will not suffice."). In addition, the duty to deal is more likely to be recognized where the defendant is ending a long-standing relationship with a competitor, *see, e.g., High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 991 (9th Cir. 1993), or where the monopolist's aid is essential. *See, e.g., Olympia Equip. Leasing Co. v. Western Union Tel.*, 802

F.2d 217, 219 (7ᵗʰ Cir. 1986) ("A monopolist is not required to subsidize its competitors by doing their selling for them."), *cert. denied*, 480 U.S. 934 (1987).

As its primary argument for dismissal, GXS argues that it has not refused to deal with Loren Data. GXS notes that the complaint identifies three current connections between the Loren Data VAN and the GXS VAN, (ECF No. 9-1, at 23 (citing ECF No. 1 ¶ 10)), and that Loren Data has not alleged that GXS will discontinue all connections in the future, only that GXS wants to renegotiate the terms and may charge more for access to its VAN. (*Id.* at 24). In response, Loren Data contends that GXS has refused to deal on certain occasions by refusing Loren Data's requests for interconnects and by countering the $3500 per month offer of InovisWorks to connect to GXS through its VAN with an offer to use GXS' mailbox for $13,000 per month. (ECF No. 14, at 13).

As a general matter, GXS is correct that a refusal to deal at the terms and conditions desired by a plaintiff does not violate the Sherman Act. *See Abcor Corp. v. AM Int'l Inc.*, 916 F.2d 924, 929-30 (4ᵗʰ Cir. 1990) (holding that defendant had not engaged in anti-competitive behavior when it enacted policy that shifted costs of maintaining inventory to a competitor who had previously gotten a "free ride"); *Lauren Sand & Gravel, Inc. v.*

25

*CSX Transp., Inc.*, 924 F.2d 539, 544-45 (4th Cir.), *cert. denied*, 502 U.S. 814 (1991); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1296 (11th Cir. 2004) ("Section 2 of the Sherman Act does not require [defendant] to give its product freely to its competitors."). There need not be an outright refusal to deal, however, if a defendant offers only unreasonable terms for access to an essential facility under its control. *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 179-80 (2[d] Cir. 1990). Thus, while Loren Data's complaint has not stated facts to support the allegation that GXS has refused entirely to deal, if Loren Data has pleaded facts to establish that GSX' VAN is an essential facility and that the terms offered by GSX were unreasonable, its claim for monopolization may survive.

The essential facilities doctrine has never been expressly rejected or adopted by the Supreme Court, *Trinko*, 540 U.S. at 410, but has been cited and relied upon by the courts of appeal. *See, e.g., MCI Commc'ns v. Am. Tel. & Tel.* Co., 708 F.2d 1081, 1132-33 (7th Cir.), *cert. denied*, 464 U.S. 891 (1983); *Laurel Sand & Gravel, Inc.*, 924 F.2d at 544; *Delaware & Hudson Ry. Co.*, 902 F.2d at 179-80. In order to establish a violation of section 2 using this doctrine, four elements must be proven: (1) control by the monopolist of the essential facility; (2) the

inability of the competitor seeking access to practically or reasonably duplicate the facility; (3) the denial of the facility to the competitor; and (4) the feasibility of the monopolist to provide the facility. *Laurel Sand & Gravel,* 924 F.2d at 544. To be essential, "a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir. 1986). Other courts have explained that the facility must not be "merely helpful, but vital to the claimant's competitive viability," *Am. Online, Inc. v. GreatDeals.Net*, 49 F.Supp.2d 851, 862 (E.D.Va. 1999), and that a plaintiff must show "more than inconvenience or even some economic loss" stemming from the lack of access to the facility to establish that it is essential. *Advance Health-Care Servs. v. Giles Mem'l Hosp.*, 846 F.Supp. 488, 498 (W.D.Va. 1994). Moreover, the owner of an essential facility is not obligated to make it available under whatever terms the competitor wishes; the owner need only offer access under reasonable terms. *See Laurel Sand & Gravel, Inc.*, 924 F.2d at 544. Terms are not unreasonable simply because they will reduce a competitor's profits. *Id.* Indeed as the Seventh Circuit has explained, "the most economical route is not an

essential facility when other routes are available." *Midwest Gas Servs., Inc. v. Indiana Gas Co., Inc.*, 317 F.3d 703, 714 (7th Cir. 2003) (citing *Endsley v. City of Chicago*, 230 F.3d 276, 683 (7th Cir. 2000)) (holding that defendant's refusal to allow plaintiff to interconnect to its gas pipeline network where other routes were available to transport the gas to its end destination did not constitute denial of access to an essential facility).

Here, Loren Data has not alleged facts to establish that GXS is liable pursuant to the essential facilities doctrine. Although Loren Data tries to argue that without an interconnect to the GSX VAN it cannot continue its business operations, the alleged facts do not demonstrate that the GXS VAN is essential or that Loren Data has not been offered reasonable means of access. First, Loren Data acknowledges that there are at least 36 VANs aside from GXS, as well as other means of transferring EDI from one trading partner to another. In addition, the complaint alleges that Loren Data has successfully worked around GXS' refusal to provide an interconnect for the past ten years, by using a metered mailbox and by interconnecting with other VANs that can interconnect with GXS' customers. There are also no alleged facts from which one can conclude that the terms

offered by GXS for Loren Data to connect via a commercial mailbox are unreasonable.

### b.    Attempted Monopoly

In contrast to claims of actual monopolization, to establish attempted monopoly under section 2 a plaintiff must demonstrate that the defendant had specific intent to monopolize and a dangerous probability of success at achieving monopoly power. *In re Microsoft Antitrust Litig.*, 333 F.3d 517, 534 (4th Cir. 2003). Specific intent may be inferred from the defendant's anticompetitive practices. *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992) (citing *Abcor*, 916 F.2d at 927; *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 802 (8th Cir. 1987)). But where there are legitimate business reasons motivating a refusal to deal, the requisite intent for an attempt to monopolize claim is not met. *See J.H. Westerbeke Corp. v Onan Corp.*, 580 F.Supp. 1173 (D.Mass. 1984).

GXS contends that Loren Data has failed to state a claim for attempted monopolization because it has not alleged facts to show specific intent or a dangerous probability of success. As discussed above, the conduct that Loren Data alleges does not demonstrate that GSX had an intent to monopolize. GSX does business with other VAN providers, large and small, including

offering them interconnects. Loren Data has also not alleged facts to establish a dangerous probability that GXS will succeed in establishing a monopoly. The requirements for establishing a dangerous probability of success were set forth in *M & M Medical Supplies and Service, Inc.*. There the Fourth Circuit explained:

> The third element of attempted monopolization, a dangerous probability of success, must be shown to be substantial and real. Market share is relevant, but its relevance is tempered by evidence of the other two elements of the claim. Compelling evidence of an intent to monopolize or of anticompetitive conduct reduces the level of market share that need be shown. Conversely, weak evidence of the other two elements requires a showing of significant market share. A rising share may show more probability of success than a falling share. Other factors must be considered, such as ease of entry, which heralds slight chance of success, or exclusionary conduct without the justification of efficiency, which enhances the likelihood of success.

981 F.2d at 168 (citing generally 3 Philip Areeda & Donald F. Turner, Antitrust Law ¶ 835, at 346-48 (1978)).

Loren Data alleges that GXS has conducted "an aggressive campaign" in the last decade to control and monopolize the EDI communications market and identifies two examples in support: (1) GXS' acquisition of a division of IBM in 2005; and (2) its merger with Inovis in 2010. (ECF No. 1 ¶ 7). Putting aside Loren Data's characterizations, two acquisitions in a ten year period with no allegation of plans for future mergers or

acquisitions do not suggest that GXS is on the path to market domination. Loren Data further attempts to characterize GXS' refusal to grant Loren Data an interconnect as the latest iteration of GXS' monopolization goals. The problem with this argument is that Loren Data simultaneously alleges that GXS has granted interconnects to every other VAN, large or small, and that GXS has refused to grant an interconnect to Loren Data for the past ten years. (*Id.* ¶ 6). GXS is not likely to gain monopoly control over the industry if it refuses to deal with only one of 36 available VAN networks. Moreover the fact that GXS has granted interconnects to so many other VANs makes it unlikely that GXS' denial of an interconnect to Loren Data will have a negative impact on competition in the relevant market.

For all these reasons, Loren Data has not stated a claim for monopolization or attempted monopolization under section 2 of the Sherman Act.

### B.  Maryland State Law Claims

GXS argues that if the federal claims are dismissed, the state law claims must also be dismissed for lack of subject matter jurisdiction. GXS argues, first, that Loren Data did not allege supplemental jurisdiction over the state law claims and, second, that once the federal antitrust claims are dismissed there is no reason for the court to exercise jurisdiction over

the state law claims. (ECF No. 9-1, at 43-44). Loren Data did not respond to these arguments in its opposition.

Counts IV, V, and VI of Loren Data's complaint arise under Maryland state law. Title 28 U.S.C. § 1367 grants federal courts supplemental jurisdiction over state law claims that are related to claims for which the court has original jurisdiction. GXS argues that Loren Data's failure to invoke this statute in its complaint is fatal and precludes the court from exercising jurisdiction over the state law claims. Ordinarily a party should provide "a short plain statement of the grounds upon which the court's jurisdiction depends." *Pinkley Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999) (citing Fed.R.Civ.P. 8(a)(1)), *cert. denied*, 528 U.S. 1155 (2000). The Fourth Circuit went on to note in *Pinkley*:

> there is some authority that in the absence of an affirmative pleading of a jurisdictional basis a federal court may find that it has jurisdiction if the facts supporting jurisdiction have been clearly pleaded. 'The pleading can either refer to the appropriate jurisdictional statute or contain factual assertions that, if proved, establish jurisdiction.'

*Id.* (quoting 2 Moore's Federal Practice § 8.03[3] (3d ed. 1997)). Consequently, Loren Data's failure to invoke 28 U.S.C. § 1367 does not mandate dismissal of its state law claims. Furthermore, although diversity jurisdiction is not referenced

in the body of its complaint, Loren Data's civil cover sheet indicates its intent to invoke diversity jurisdiction, identifies the parties as having diverse citizenship, and states a total amount in controversy in excess of $75,000. (*See* ECF No. 1-1). The complaint also alleges facts to support diversity jurisdiction for some claims. For this reason, the merits of Loren Data's state law claims should be considered.

### 1. Maryland Antitrust Law Claim

Count IV alleges a violation of Maryland's antitrust law, Md. Code Ann. § Com. Law §§ 11-204(a)(1)-(3). Sections 11-204(a)(1) and 11-204(a)(2) mirror sections 1 and 2 of the Sherman Act and are interpreted concordantly with the Sherman Act.[3] *havePOWER, LLC v. Gen. Elec. Co.*, 183 F.Supp.2d 779, 785 n.4 (D.Md. 2002) (recognizing that Md. Code Ann., Com. Law § 11-202(a)(2) expressly states the General Assembly's intent that when construing the antitrust subtitle, courts should "be guided by the interpretation given by the federal courts to the

---

[3] Md. Code Ann. § Com. Law § 11-204(a)(1) provides that a person may not "[b]y contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce." § 11-204(a)(2) provides that a person may not "[m]onopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce."

various federal statues dealing with the same or similar matters, including . . . 15 U.S.C. §§ 1 though 7."); *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 53 and 67 (1984) ("Section 11-204(a)(1) of the Maryland Act is essentially the same as § 1 of the Sherman Antitrust Act" and "Section 11-204(a)(2) is analogous to § 2 of the Sherman Act"). When an antitrust claim fails under federal law, that claim will also fail under the analogous Maryland state antitrust law. *Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 379 (4th Cir. 1992). Accordingly, Loren Data's claims that GXS has violated §§ 11-204(a)(1) and (2) must be dismissed.

Loren Data has not alleged a violation of federal law that directly parallels Md. Code Ann., Com. Law § 11-204(a)(3). This subsection provides that one may not:

> Directly or indirectly discriminate in price among purchasers of commodities or services of like grade and quality, if the effects of the discrimination may:
>
> (i) Substantially lessen competition;
>
> (ii) Tend to create a monopoly in any line of trade or commerce; or
>
> (iii) Injure, destroy, or prevent competition with any person who grants or knowingly receives the benefit of the discrimination or with customers of either of them[.]

This subsection mirrors section 13(a) of the Robinson Patman Act, 15 U.S.C. § 13(a). *See Soth v. Baltimore Sun Co.*, 4 F.Supp.2d 417, 420 (D.Md. 1996); *Berlyn, Inc. v. Gazette Newspapers*, 223 F.Supp.2d 718, 741-42 (D.Md. 2002). To state a claim for price discrimination under the Robinson Patman Act, a plaintiff must allege that (1) the commodity or service was sold in interstate commerce; (2) the services or goods sold to plaintiff were of the same grade or quality as those sold to others; (3) the defendant discriminated in price between plaintiff and others; and (4) the discrimination had a prohibited effect on competition. *Texaco, Inc. v. Hasbrouch*, 496 U.S. 543, 556 (1990); *Mikeron, Inc. v. Exxon Co.*, 264 F.Supp.2d 268, 275 (D.Md. 2003). The same requirements apply to claims stating a violation of § 11-204(a)(3) of Maryland's antitrust law, absent the requirement of an interstate nexus.

Here, Loren Data has failed to state a claim under § 11-204(a)(3) because it has not alleged a prohibited effect on competition. With respect to this count, Loren Data's allegation is nothing more than a recitation of the statutory language with no additional facts to distinguish this claim from any of the other antitrust violations alleged. And as discussed above, Loren Data has not alleged facts that show that GXS has or is attempting to obtain monopoly power, or that GXS' actions

have had or will have a negative effect on competition.  For all these reasons, count IV will be dismissed.

### 2.    Tortious Interference

Count V alleges that GXS tortiously interfered with Loren Data's business relationships.  A tortious interference claim under Maryland law requires proof of intentional acts "done with the unlawful purpose to cause . . . damage and loss to the plaintiffs in their lawful business, without right or justifiable cause on the part of the defendants which constitutes malice[.]" *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 655 (1994) (internal quotations omitted).  "Wrongful or unlawful acts include common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *K & K Mgmt. v. Lee*, 316 Md. 137, 166 (1989) (internal quotations omitted).  The tort does not lie simply because the defendant's breach of contract "would foreseeably impinge upon a contracting party's economic relations with others." *Alexander & Alexander Inc.*, 336 Md. at 656.

The complaint does not identify the specific wrongful acts upon which Loren Data is relying for its claim.  GXS contends

36

that the only potential wrongful acts alleged are the antitrust violations and because these claims are being dismissed the tortious interference claim also fails. (ECF No. 9-1, at 46-47). Loren Data concedes that its antitrust allegations were one basis for its wrongful interference claim but argues that the complaint contains other allegations of conduct that could constitute wrongful interference. (ECF No. 14, at 28). Specifically, Loren Data lists: (1) GXS' general denial of the industry standard settlement interconnect; (2) GXS' breach of Loren Data's contract with Inovis by discontinuing Loren Data's interconnect with Tradanet in the United Kingdom; (3) GXS' failure to service IBM's contract with the Department of Defense under which Loren Data was a subcontractor; (4) GXS' interference with Loren Data's client relations; (5) and GXS persistent refusal to grant an appropriately configured interconnect after settlement in the Covisint matter. (*Id.*). None of these allegations identify conduct that has been recognized as wrongful or unlawful for the purpose of stating a claim for tortious interference. Loren Data's failure to allege a wrongful act is fatal to its tortious interference claim.

### 3. Breach of Contract

Finally, count VI alleges that GXS is liable for breach of contract. The original complaint alleged only that GXS "is in

breach of its contracts with the Plaintiff both in its long-term relationship and in its current contract with Inovis, Inc." (ECF No. 1 ¶ 45). The supplemental statement of facts in the amended complaint elaborates on this claim and identifies two specific contracts that GXS allegedly breached. (ECF No. 13 ¶ 11). For the first identified contract, Loren Data alleges damages of $24,832.49; no amount of damages is alleged for breach of the second contract.

Assuming that Loren Data has alleged adequate facts to state a claim for breach of contract, it has not alleged adequate damages for the court to exercise independent diversity jurisdiction over this count. 28 U.S.C. § 1332(a) gives federal district courts diversity jurisdiction only for civil actions where the amount in controversy "exceeds the sum or value of $75,000." Count VI alleges an amount of damages significantly below the statutory threshold. Typically claims can be aggregated to satisfy the minimum threshold, but because the remainder of Loren Data's counts will be dismissed for failure to state a claim, and count VI does not satisfy the minimum threshold on its own, the court merely possesses potential supplemental jurisdiction over this count. *Shanaghan v. Cahill*, 58 F.3d 106, 109-10 (4th Cir. 1995). As noted therein, 28 U.S.C. § 1367(c)(3) provides that "the district courts may decline to

exercise supplemental jurisdiction over a claim . . . if . . .
the district court has dismissed all claims over which it has
original jurisdiction." Dismissal is favored in cases turning
primarily on questions of state law, because "[n]eedless
decisions of state law [by federal courts] should be avoided
both as a matter of comity and to promote justice between the
parties, by procuring for them a surer-footed reading of
applicable law." *United Mine Workers of America v. Gibbs*, 383
U.S. 715, 726 (1966). Particularly in a case, such as this one,
before trial or even discovery, has begun, "the balance of
factors . . . point[s] toward declining to exercise jurisdiction
over the remaining state-law claims." *Carnegie-Mellon Univ. v.
Cohill*, 484 U.S. 343, 350, n.7 (1988); *see also Taylor v. Giant
Food, Inc.*, 438 F.Supp.2d 576, 580 (D.Md. 2006).

Thus, the breach of contract count will be dismissed
without prejudice for lack of subject matter jurisdiction.
Loren Data will be free to pursue this claim upon filing suit in
an appropriate state court.

## IV.  Conclusion

For the foregoing reasons, the motion to dismiss filed by Defendant GXS, Inc. will be granted.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
